In the Matter of CLINTON O. HURTT, Petitioner, v. NEW YORK CITY TRANSIT AUTHORITY, Respondent.— Proceeding under article 78 of the CPLR (1) to annul respondent's determination, dated February 29, 1968 and made after a hearing, dismissing petitioner from his position of Transit Patrolman, and (2) for reinstatement to said position, with back pay. Determination confirmed and proceeding dismissed on the merits, without costs. No opinion. Christ, Acting P. J., Rabin and Munder, JJ., concur; Martuscello, J., dissents and votes to annul the determination and to direct that petitioner be reinstated to his position, with back pay, with the following memorandum, in which Benjamin, J., concurs: Petitioner was dismissed from his position of Transit Patrolman by respondent on February 29, 1968, after the latter approved a recommendation of dismissal by a Hearing Referee submitted January 26, 1968, on the ground that petitioner was not medically qualified to perform all of the duties of a Transit Patrolman by reason of medical incompetence. It appears from the record that petitioner graduated from Lunenberg High School in Victoria, Virginia, in 1954. He then attended Morgan State College in Baltimore for two years and was honorably discharged from the United States Army after serving three years with the 101st Airborne Division. He was appointed a Probationary Transit Patrolman on May 3, 1965 and was assigned to the position of Transit Patrolman on July 28, 1965. Petitioner's present difficulties

stem from inaccurate statements made by him to respondent and to the Cerberean Society, a fraternal order to which he belonged. The Society's membership apparently was limited to Transit Authority employees. It appears from the record that education was very important to petitioner and that he would defend himself against anyone who "would fool around with education around him." It further appears that this defense reaction took the form of petitioner's bragging about his alleged scholastic achievements. These alleged achievements, which were in fact untrue, included a baccalaureate degree from Columbia University and the near-completion of a Master's Degree in public administration. Rumors reflecting these boasts spread and petitioner was referred by the Chief of Planning, on the latter's own initiative, for an interview in January, 1967, for possible assignment to the Planning Division. At this interview, petitioner made some untruthful statements to the interviewer about his scholastic background and accomplishments. Subsequently, the Cerberean Society held a dinner-dance in May, 1967, and on their own initiative gave petitioner a plaque reflecting his performance of duty and his alleged scholastic achievements. As a result of this award, of which the Planning Department was informally made aware, petitioner was again referred to that department for an interview for possible placement in June, 1967. At that interview petitioner repeated the untruthful statements he had made earlier. Subsequently, he was confronted with the false statements he had made, finally admitted his error late in June, 1967, and returned the plaque he had received. Thereafter he was placed on restricted duty and was examined by respondent's psychiatrist, Dr. Remo Cerulli, in July, 1967. After that examination, petitioner was continued on restricted duty. Dr. Cerulli testified at the hearing that his examination of petitioner in July, 1967, revealed a personality disorder "with pathological lying and fabrication secondary to a compulsive nature of his asocial acts of a neurotic type." The doctor testified that petitioner's erratic actions were due to certain stress situations which included in this case the serious illness of petitioner's wife during the time he made the fabrications and received the award on false premises. The doctor further noted that petitioner had certain motivations, "perhaps infantile", in making false statements about his educational background. On September 22, 1967, petitioner was examined again by Dr. Cerulli, who stated in his examination report, which was part of the record below before respondent's Hearing Referee: "the psychodynamics of this condition is one of nondestructive and harmless nature. Probably, through discipline and his ability to learn will correct his neurotic trait. No serious mental illness. *Recommendation:* There is no objection or psychiatric cause if this individual returns to his former duty." At the hearing, Dr. Cerulli testified to the same effect: "Now, in my mental examination on September 22nd, 1967, it revealed a rather athletic type, affable, cooperative, jovial, married man who discussed his problems heretofore mentioned with a feeling of acknowledgement and confession. No psychotic reaction was elicited. No serious personality trait was elicited. There was a great probability that there is a deep-seated compulsive reaction present. My opinion as a result of this examination was one of — that this individual — it is highly possible that this individual has a character neurosis, a compulsive need to satisfy his deep-seated anxiety created by the great concern and anxiety producing situation of his wife's illness. I wish to offer further that the psychodynamics of this condition is one of nondestructive and of a harmless nature. Probably through discipline and his ability to learn, will correct his neurotic trait, no serious mental illness." The doctor further indicated that petitioner's acceptance of the nonmonetary award from the Society (while admittedly under the stress of his wife's illness) indicated the type of personality susceptible to

the receipt of bribe offers. He further testified that he found nothing to indicate that petitioner would use his gun improperly. Dr. Richard Frenkel, a psychiatrist testifying for petitioner, stated that his examination of petitioner in January, 1968, revealed " a passive aggressive, passive dependent personality type ", that this is a common disturbance in many people, and that these individuals function normally without serious problems. The doctor further testified that petitioner's problem did not constitute a serious mental illness; that he was not a pathological liar; that his infirmity would not make him susceptible to bribery; that petitioner was " defending himself against certain stressful situations going on around him "; that education was very important to him; that he would react, albeit harmlessly, to anyone who " would fool around with education around him "; and that he was medically competent to continue full duty as a Transit Patrolman. Respondent contends that its determination must stand, absent a showing of fraud, mistake or lack of competent evidence, and that the conflict in the medical testimony alone cannot justify a finding that it (respondent) acted arbitrarily and capriciously (*Matter of Tiernan* v. *Walsh*, 294 N. Y. 299). In my opinion, the medical evidence presented by respondent fails to establish the medical incompetence of petitioner, either mental or physical. The picture presented there is one of a Transit Patrolman who attended college for several years, was honorably discharged from the Army, and served as a Transit Patrolman for 2½ years. Prior to this proceeding he had a spotless record and had never been cited on charges of misconduct or insubordination. Moreover, there is no evidence of any other instance of fabrication in connection with any official duty during his nearly three years of service with respondent. Petitioner, while subjected to serious emotional strain (his wife's illness), made several false statements to respondent and the Cerberean Society about his scholastic achievements. When he was discovered, he admitted his error and returned the plaque that had been awarded to him. The doctor who testified for respondent conceded himself that the disorder he had found in petitioner was nondestructive and harmless. Moreover, his examination report of September 22, 1967 stated that there was no objection to petitioner's returning to his former status. Respondent's doctor's attempt to project into petitioner's character an inclination and susceptibility toward bribery, on the basis of a sole instance whereby petitioner accepted a nonmonetary award from a fraternal society which he did not deserve, is in my opinion unwarranted and dangerous conjecture. In making false statements about his educational background and in accepting the unsolicited award, petitioner was obviously motivated by a desire for status and recognition from fellow employees. There is absolutely no indication in the record that petitioner, in accepting the plaque, was motivated by greed. It is greed, and not a childlike desire for status, that distinguishes the individual who succumbs and accepts a bribe. If a single instance of self-puffing with respect to educational or social achievements totally unrelated to one's official duties, but merely braggadocio with respect to extracurricular achievements, is to be deemed a disqualification, for mental illness, a great many people in our classified and unclassified civil service could be subject to similar disqualification. The view of the majority here represents a social and economic danger to our Civil Service. In my opinion, the medical testimony in the record negates any mental or physical illness which would hinder petitioner from performing his duties. Accordingly, petitioner should be restored to full unrestricted duty, with back pay.